[Campbell v. Noble.]

# Campbell v. Noble.

*Statutory Action of Ejectment.*

1. *Construction of deed or will unskillfully drawn.*—In the construction of a deed or will which shows on its face that it was drawn by an ignorant person, or one who was not acquainted with the force and use of the technical words used, a greater latitude of construction is indulged than when it is skillfully drawn, and appears to have been written by a person who was familiar with the use of technical terms; and in such instrument, the indiscriminate use of the words "heir" or "heirs", and "child" or "children", to designate the same class of persons, is a marked manifestation of the unskillfullness on the part of the draftsman of such instrument.

2. *Wills or deeds; construction of words "heir" or "heirs."*—While much strictness must be observed in construing words of limitation according to their legal and technical import, still, where a will or deed is so framed in its entirety, and such terms and expressions are used therein, considered in the light of the condition and circumstances of the devisor or grantor as to justify it, the court will first ascertain how the instrument should be read according to the true intent and meaning of the person executing it; and if it is obvious that the word "heir" or "heirs", as used in said instrument, was so used for "child" or "children," in order to give effect to what was really intended, the latter words will be substituted for the former expression in the construction of said instrument.

3. *Same; same; case at bar.*—A testator, after devising a life estate in certain property to his daughter, subject to a life estate to one-half thereof in his grand-daughter (his said daughter's child) after her marriage, provided in his will, that if the grand-daughter had "an heir or heirs," she should, after the death of her father and mother, take the whole property, and, if she died leaving no "heir or heirs of her body," all the property acquired by her under the will should be divided equally among all of the testator's then living children, and such of his grand-children whose parents may have previously died, and if said grand-daughter should leave an "heir or heirs, I [the testator] give it to them forever." It was manifest from the instrument itself that the will was drawn by an unskillful draftsman, and terms of different legal signification were used indiscriminately to express the same meaning, and the will, taken as a whole, clearly showed that the testator used the expressions "heir" or "heirs", "heir or heirs of her body," as synonymous with "child" or "children." The said grand-daughter married and gave birth to a child who lived but a few hours, and the grand-daughter died after her husband, leaving

[Campbell v. Noble.]

surviving her her widowed mother, her father having previously died. *Held:* That on the death of the mother of said grand-daughter, the grand-children of the testator took as purchasers unaffected by any conveyance of said grand-daughter during her life, since she acquired only a life estate under the will.

APPEAL from the Circuit Court of Colbert.

Tried before the Hon. H. C. SPEAKE.

This was a statutory action of ejectment brought by Lucy G. Campbell, Rachael Crutchfield, M. H. Yerger, Mrs. Kirby Lann, Woofie Hogan, Sarah Hogan, C. Mattie Andrews and Jennie L. Burke against Thomas B. Bickley. On application of Sarah E. Noble, it was shown that Thomas B. Bickley, the original defendant, was her tenant, and the said Sarah E. Noble was made a party to the suit. The lands sued for were described in the complaint as follows: "The south half of section (24) twenty-four, township (4) four, range (11) eleven; the east half of the north-west quarter and north half of north-east quarter of section (24), township (4), and range (11) eleven; the south-east quarter of the north-east ($\frac{1}{4}$) quarter, and also the north-west ($\frac{1}{4}$) of the north-east ($\frac{1}{4}$) of section (11) eleven, township (5) five, and range (11) eleven, being in Colbert county."

The plaintiffs introduced in evidence the will and codicil of Arthur S. Hogan, and it was shown that this will and codicil were properly executed and duly admitted to probate in April, 1850. The will was in words and figures as follows: "Considering the uncertainty of this mortal life, of sound mind, I thank my God for the same, I make this my last will and testament: Item the 1st. I have given and delivered to my daughter Matilda, wife of James Rucks, now deceased, five negroes and three thousand dollars in money. I have given and delivered to my four grand-children, Arthur, James and Henry Rucks and Malvina, now wife of William Yerger, the following named negroes, to-wit: Petre, Castle, Agy, Phillis, Reuben, Polly, Willis, Abraham, Monroe, Louisa and Gilford, one horse and two mules, one hundred dollars to William Yerger and seventy-three dollars in money to each of said grand children.

"Item the 2d. I have given and delivered to my daughter Harriett Goodall, now widow, one negro woman Milly, also five thousand, one hundred and seven-

ty dollars in money. I have loaned and delivered unto my said daughter Harriett the following named negroes, towit : George, Jerry, Harry, Caroline, Drew, Whitwell, Bowling, Susan, Julia, Pleasant and Charlotte, during her lifetime, also the plantation on which she now resides in Smith county, State of Tennessee, including the island in the Cumberland river, together with the north bank of the said river at Carthage for a ferry landing. After her death, I give all to my two grand children Rachael and Lucy and their heirs forever.

"Item the 3d. I have given and delivered to my son William B. Hogan nine negroes and twenty-five hundred and fifty dollars in money. I loan to my said son for the benefit of his wife and children and all that they may hereafter have, the plantation where he now resides, containing one section, also the following named negroes, to-wit : Timson, Huger, Joe, Cintha, Neb, Elizabeth, Jack, Ann, Redick, and James, to be equally divided between all of his heirs after his death.

"Item the 4th. My son Samuel died without heirs.

"Item the 5th. My grand-daughter Elizabeth Winter, whenever she shall marry, she shall take into possession one-half of the plantation, one-half of the brick house lying in Franklin county, State of Alabama, also eighty acres of land lying at the foot of the mountain, one-half of the negroes named in items next below.

"If the said Elizabeth shall have an heir or heirs, in that case after the death of her father and mother, she shall have the whole of the plantation and house and lot in the town of Tuscumbia, together with the balance of the negroes, she having first to set apart or provide for the genteel support of her sister Josephine during her life. If the said Elizabeth die and leave no heir or heirs of her body, my will is that all of the property she may acquire by this will shall be equally divided between all of my children living and such of my grand-children whose parents may have died, and if she should die and leave an heir or heirs, I give it to them forever.

"Item the 6th. I had given four negroes to Sally Ann, now wife of T. W. Winter. I now loan to my said daughter the plantation on which she now resides on in the county of Franklin, State of Alabama, also eighty acres of land lying at the foot of the mountain, a house and lot in the town of Tuscumbia, and the following

[Campbell v. Noble.]

named negroes, to-wit:   Hannah, Violet, Francis, Nina, Henry,  George,  Charity,  Anderson, Dempsey,  Traser, Edy, Sarah, Wilson, Malvina, Lunsford, Simon, Austin, Maria, and two mules; when her daughter Elizabeth marries the one-half of the above named negroes shall be delivered to her and one-half of the plantation and one-half of the brick house on said plantation.   I do hereby appoint T. W. Winter guardian and agent for his wife and his daughter during life.

"Item the 7th.   I loan unto my daughter Amanda M., wife of W. E. Walker, the plantation on which I now reside, containing one section; also the following named negroes, to-wit:   Hannah, Buck, Eliza, Phillissia, Madora, Louisa, Charlotte, Seniora, Charles, Isaac, Jane, Jack, Jim, Nancy, Mary, Victoria, Milly, Anthony, Margarett, John, George, Lucy, Caty, Juny, Charles, Attamont, Sandy, Trar, Henry, together with their increase; one mare, five mules, some cattle and household furniture.   I do hereby appoint W. E. Walker guardian and agent for his wife and children during his life, after his death and the death of his wife, the above named property to be divided equally between all of his heirs.   It is understood that W. E. Walker is acting as my agent at the present time and all the crops are to go to the use and benefit of his wife and children.

"Item the 8th.   My children all know that my woman Edy, came into my family by their step-mother, at her death, requested me to fix it so that the said woman Edy might have her time and labor at my death, and I promised her I would do so.   Should the said woman Edy have a child or children, I give all of her increase to my grand-son Preston Hogan.   I leave to the said woman Edy, her time and labor during her life.   I give to the said woman Edy one mare, one cow and calf, one sow and pigs and fifty dollars in cash during her life.

"I appoint my son William B. Hogan my sole executor.

"Given under my hand and seal this twenty-second of January, eighteen hundred and forty-nine.   No security to be required.   [Signed.]   Art. S. Hogan.  (Seal.)"

The codicil of the will was as follows: "I, Art. S. Hogan, in the will above, having disposed of the most of my estate, do make this codicil and dispose of the bal-

[Campbell v. Noble.]

ance of his estate as follows : The two negro boys, William and Jerry, I give to my four grand-children and to be equally divided between them as in item the first in the will. I add nine hundred dollars to item the second in my will to Harriett Goodall, which will fall to me from the estate of my brother James Hogan. This sum is to be laid out in buying land adjoining her down the river, if it can be bought at twelve dollars per acre, if not to be laid out in negroes, and in either case to descend as the property in the aforesaid will in item the second. To item three in my will I add one negro boy Hampton, and five hundred dollars to my son W. B. Hogan.

"To item the sixth in my will, I add my large Catholic Bible to my daughter Sally Ann Winter, she being already provided for. To item the seventh in my will, the woman Tennessee to be added to my daughter Amanda M. Walker and to be under the same restrictions as is provided in said item, also one sorrel mare.

"I loan to my woman Edy, as named in my will, one house and lot in the old town of Aberdeen, No. twenty. She is to have complete control of the house and lot during her life, after her death, I give the house and lot to my grand-son Preston Hogan forever.

"W. B. Hogan is to have the house built and is to have one hundred and ninety-seven dollars paid him out of any money belonging to my estate. W. B. Hogan, my executor, is to have full power at all times to prevent the negroes from being carried out of the State of Alabama. I mean the negroes that are named in my will as loaned to T. W. Winter and my daughter Sally Ann Winter, his wife. The balance of all the moneys that may belong to my estate to be divided between W. H. Hogan and W. E. Walker. Given under my hand and seal this fourth day of May, eighteen hundred and forty-nine. [Signed.] Art. S. Hogan. Seal "

It was shown by the evidence that all the children of Arthur S. Hogan were dead before this suit was instituted, and the husband of Matilda Rucks and Harriett Goodall, Amanda M. Walker and Sally Ann Winter are all dead ; that M. H. Yerger, Kirby Lane are children of Matilda Rucks, who is mentioned in item 1 of the will. Lucy G. Campbell and Rachael Crutchfield are children of Harriett Goodall who is mentioned in item

2d of the will. Woofie Hogan, Sarah Hogan and C. Mattie Andrews are the children of W. B. Hogan who is mentioned in item 3d of the will; Samuel Hogan died before the will was executed. Sally Ann Winter had two children Elizabeth and Josephine, both of whom were mentioned in item 5 of the will. Josephine died without children on the 15th day of November, 1866. Elizabeth Winter married R. E. Bell. She and her husband are both dead; Elizabeth died on the 8th day of August, 1891. She had no children or decendants of children living at the time of her death; Sally Ann Winter, her mother, died on May 6th, 1892. Plaintiffs then proved by Nancy Napier that she knew Sally Ann Winter and her two children, Elizabeth and Josephine. The latter was born an idiot. Elizabeth married Robert E. Bell. They had one child born to them. Witness never saw the child, but it was generally understood and talked about as having been born dead. Witness lived in same town with Elizabeth, was with her right after the birth of the child, but never heard her mention it.

The defendant introduced in evidence a deed which was executed by Robert E. Bell, Elizabeth B. Bell, Thacker W. Winter and Sarah A. Winter, on November 17, 1860, in which they conveyed to Daniel H. Walker "all those certain parts and parcels of land lying in the county of Franklin and State of Alabama, and described as section twenty-four in township four, range eleven west, and known as the Arthur Hogan tract, also eighty acres, woodland, lying at the base of the mountain entered by W. B. Hogan." The defendant introduced evidence tending to show that upon the execution and delivery of said deed to David H. Walker, he immediately went into possession of the lands conveyed therein, part of which are sued for in the present action, and that said Walker and those who claim under him have ever since held and claimed said lands under said deed. It was further proven by defendant that one of the grantors in said deed to Walker was a daughter of Arthur S. Hogan, that she married Thacker W. Winter, another one of the grantors in said deed; that at the date and making of the will of said Hogan introduced in evidence by plaintiffs, said Sarah A. and Thacker W. Winter had two children, named Elizabeth and Josephine, who are mentioned in the will of said Hogan; that Elizabeth

[Campbell v. Noble.]

Winter intermarried with Robert Bell in 1852; and that said Elizabeth and her husband, Robert E. Bell, are the other two grantors in the deed made in 1860, conveying said land to David H. Walker. There was other evidence introduced in behalf of the defendant tending to show that Elizabeth Winter, the daughter of Thacker W. Winter and Sarah A. Winter married Robert E. Bell in 1852; that she gave birth to a living child in the summer of 1853, but that the child lived only three or four hours and then died. The other facts of the case are sufficiently stated in the opinion.

The cause was tried by the court without the intervention of a jury; and upon the hearing of all the evidence, the court rendered judgment for the defendant. The plaintiffs prosecute the present appeal, and assign this judgment as error.

KIRK & ALMON, J. B. MOORE and COOPER & ORME, for appellants.—To determine whether Elizabeth Winter took absolute estate or a life estate only of one-half of the property sued for, it is necessary to determine the true intention of the testator from the fair construction of the whole instrument.—*Hamner v. Smith,* 22 Ala. 433; *Saunders v. Saunders,* 20 Ala. 710; *Williams v. Williams,* 10 Yerger 20; *Williams v. Turner, Ib.* 287; *Pearce v. Gleaves, Ib.* 359; *Weismer v. Douglas,* 4 Hun. 208; *Jones v. Hamlet,* 2 Sneed 260; *Dunn v. Davis,* 12 Ala. 140. If the words used in the 5th clause of the will would, at common law, have created an estate tail, then under our statute, Elizabeth Winter took an absolute estate. The words as used in said 5th clause of the will were not words of purchase but of limitation, and, therefore, created an estate tail.—*McGraw v. Davenport,* 6 Porter 319; *Roberts v. Adams,* 6 Ala. 362; *Powell v. Glenn,* 21 Ala. 458; *Isbell v. Maclin,* 24 Ala. 315; *Machen v. Machen,* 15 Ala. 373; *Lenoir v. Rainey, Ib.* 667; *Ewing v. Standefer,* 18 Ala. 400; *McCullough v. Gliddon,* 33 Ala. 208; *Lloyd v. Rambo,* 35 Ala. 709; *Young v. Kennebrew,* 36 Ala. 97.

2. The will shows that it was inartificially and unskillfully drawn, and this is a very strong argument against applying strict technical rules to it.—*Saunders v. Saunders,* 20 Ala. 710; *Hamner v. Smith,* 22 Ala. 438. The indiscriminate use of the words *heir* or *heirs* of the

[Campbell v. Noble.]

body and *children* in item 5th, and the words *heirs* in items 4th and 7th of the will, to designate the same class of persons, is a marked manifestation of unskillfulness, and the want of knowledge of the difference in the legal meaning of the terms.—*May v. Ritchie*, 65 Ala. 603. In construing a will, it is the duty of the court to place itself as fully as possible, in the situation of the testator, and to construe the will in the light of all the surrounding circumstances, as they existed at the making of the will.—*Targus v. Puget*, 2 Vesey 194; *Robinson v. Robinson*, 2 Vesey 225; *Porter v. Greer*, 1 Coldwell 571; *Blackmore v. Blackmore*, 3 Sneed 365.; 2 Redfield on Wills, 514.

3. It is clear that the testator by the use of the words *heir* or *heirs* of the body in the 5th item of the will meant children, and the words so used are qualified by children and such of my grand-children in the same item, thereby designating a particular class that should take under the will, by the happening of certain contingencies or possibilities. The word *heir*, in that item, unquestionably means children. The word *heirs* may be construed as a word of purchase, if the intention of the grantor is unequivocal.—6 Amer. & Eng. Encyc. of Law, 878, note 3; *May v. Ritchie*, 65 Ala. 602.

4. The rule is, that where the terms "heirs" or "issue," "heirs of the body," or "issue of the body." are used, and no other words are used which explain and control these terms, they are words of limitation, and not words of purchase. The words of explanation must indicate that these terms are used to designate a class.—4 Kent, marg. p. 229; *Woodley v. Findlay*, 9 Ala. 719; *Mason v. Pate*, 34 Ala. 379; *Price v. Price*, 5 Ala. 531; *Machen v. Machen*, 15 Ala. 373; *Lenoir v. Rainey*, 15 Ala. 667; *Ewing v. Standefer*, 18 Ala. 400. And since the only construction and meaning of the word "heirs" in item 4th is that of children, and the explanatory words, "My children and such of my grand-children" in item 5th designate and are descriptive of a certain class, then that particular class would take as purchasers upon the determination of the estate in Elizabeth Winter.

5. Elizabeth Winter takes under the will a life estate, remainder to the heir or heirs of her body in fee, but in default of such heir or heirs (evidently meaning children) living at her death, remainder over to the children,

and such of the grand-children whose parents may have died. Such remainder is good as being collateral to the contingent fee in the issue of Elizabeth Winter.

6. The will clearly shows from the context, the intention of the testator to be, that Sally Ann was to enjoy the whole of the real property until Elizabeth married, then such as was not delivered to Elizabeth during her life, and at her death remainder to Elizabeth, and in the event Elizabeth died without leaving a child or children living at her death, remainder to the children of the testator, and such of the grand-children whose parents had died; and when there is anything in the context which shows that by the word heirs is meant children, such persons have ever been let in as purchasers.—Keys on Ch., § 246; *Dunny v. Davis*, 12 Ala. 135; *Stone v. Maule*, 2 Sim. 490; *Bell v. Hogan*, 1 Stew. 536; *Powell v. Glenn*, 21 Ala. 458; *Williamson v. Mason*, 23 Ala. 488; *McWilliams v. Ramsey*, 23 Ala. 813; *McVey v. Ijams*, 27 Ala. 238; *Elmore v. Mustin*, 28 Ala. 309; *Fellows v. Tann*, 9 Ala. 999.

Thos. R. ROULHAC, *contra*.—If the words used by the testator in the 5th item of the will are to receive the interpretation the law puts upon them—that is their legal and technical meaning—that class would have the effect to confer upon the testator's grand-daughter a fee simple title or an estate tail by the common law interpretation. Therefore, there must be found in the language of the testator something to change the primary and obvious effect of the words of the devise.—3 Jarman on Wills, 139; *Prescott v. Prescott*, 10 B. Mon. 56; *Atkinson v. Featherstone*, 1 B. & Ad. 944; *Grimson v. Downing*, 4 Drew. 125; *Powell v. Glenn*, 21 Ala. 458; *Jones v. Morgan*, 1 B. C. Rep. 206. Giving these words the effect, which in legal contemplation and by legal construction they bear, the only possible change they could accomplish in the character of the interest and estate previously conferred would be to convert, at the common law, the fee simple already devised into an estate tail. If this be so, and the will having been executed in October, 1849, the statute of Alabama then of force converted it into a fee simple.—Clay's Dig. p. 157, § 37; 1 Brick. Dig. 786, § 4; *Mason v. Pate*, 34 Ala. 379.

2. The most that can be claimed for the effect, in its

technical sense, of the language of the items in the will in question is, that it confers an estate in tail, if the legal meaning is to be attached to the words employed to express the testator's meaning.—3. Jarman on Wills, pp. 117–8, 152, 160, n. 200–239; 1 Brick. Dig. 794, §§ 99–104; *Simmons v. Augustin,* 3 Por. 69. There is nothing in the succeeding words to change the rule, that either the words "heirs," or "heirs of the body," were words of limitation, and not of purchase. Similar questions have been often presented for the adjudication of the courts. Our own and most of the courts in this country have recognized the reasoning and force of the decisions of the English tribunals, and have acquiesced in the rule, as the law then stood, to give to words of legal signification their legal import, which was necessary as a rule of property.—*Simmons v. Augustin,* 3 Por. 69; *Parish v. Parish,* 37 Ala. 591; *Mason v. Pate,* 34 Ala. 379.

3. In this case, as to heirs of the body, our court says: "The rule in Shelley's case applies, and merges the limitation over to the heirs in the life estate, and enlarges or expands the life estate into a fee."—*Price v. Price,* 5 Ala. 578; *Hamner v. Smith,* 22 Ala. 433; *Ewing v. Standefer,* 18 Ala. 400; *Machen v. Machen,* 15 Ala. 373, *Isbell v. Maclin,* 24 Ala. 315; *Shackelford v. Bullock,* 34 Ala. 418; *Lloyd v. Rambo,* 35 Ala. 709; *Lenoir v. Rainey,* 15 Ala. 669; *Anderson v. Anderson,* 30 Beav. 209; 3 Jarman on Wills, pp. 146–7, 152–3, 163, 168–9.

4. The appellees and those from whom they claim bought the property on the faith of the former decisions of the court, adopting what our court has decided was the correct rule of construction. It is manifest that Judge Peters was influenced in his decision in the case of *Edwards v. Bibb,* 43 Ala. 666, more by what was then the statute law of the State, now section 1825 of the Code, than by the one in existence and force when the Bibb will was made and went into effect, or than by the decisions of our court construing the former law. If this last expression of our court is correct, as to devises antedating the present law, that of 1852, it is clear that the sale by Elizabeth Winter was sanctioned by the decisions of the State existing when the devise to her was written and became operative. The decision of our court in *Martin v. McRee,* 30 Ala. 116, would seem to be con-

clusive on the construction of the devise. And all the authorities now hold, that such a construction of a statute, deed or will becomes a rule of property, and persons purchasing the property affected by it, while the decision prevails, are to be protected. Here, while the decisions of Alabama, as rendered in *Simmons v. Augustin* and *Martin v. McRee*, stood as the rule of property under such devises, Walker purchased this property.—*Farrior v. N. E. Mortgage Co.*, 92 Ala. 181; *Fairfield v. County of Gallatin*, 100 U. S. 52.

5. The rule is well settled that "where a devisee, whose estate is undefined, is directed to pay the testator's debts or legacies, or a specific sum in gross, he takes an estate in fee, on the ground that if he took an estate for life only, or less than a fee, he might be damnified by the determination of his interest before re-imbursement of his expenditure.—*McRee v. Means*, 34 Ala. 377; *Jackson v. Martin*, 18 Johns. 31; 3 Jarman on Wills, pp. 22–26; 2 Redf. on Wills, 716.

HEAD, J.—This controversy turns upon the proper construction of item 5 of Arthur S. Hogan's will, viz.: "My grand-daughter, Elizabeth Winter, whenever she shall marry, she shall take into possession one-half of the plantation, one-half of the brick house lying in Franklin county, State of Alabama, also eighty acres of land lying at the foot of the mountain, one-half of the negroes named in the item next below. If the said Elizabeth shall have an heir or heirs, in that case after the death of her father and mother she shall have the whole of the plantation and house and lot in the town of Tuscumbia, together with the balance of the negroes, she having first to set apart or provide for the genteel support of her sister Josephine during her life. If the said Elizabeth die and leave no heir or heirs of her body, my will is that all of the property she may acquire by the will shall be equally divided between all of my children living and such of my grandchildren whose parents may have died, and if she should die and leave an heir or heirs I give it to them forever." The testator died in 1849. When his will was made and when he died, he had living a number of children and grandchildren. The devisee in question, Elizabeth Winter, married one Bell, and had one child who lived three or four hours

[Campbell v. Noble.]

and died. Her sister, Josephine, was an imbecile or idiot, and died in 1866. Her father died not long afterwards. Her husband, Bell, died in 1873, she in 1891, and her mother in 1892. By the 6th item of the will the testator created an estate in these lands in his daughter, Sally Ann Winter, who was the mother of said Elizabeth and Josephine, in the following language: "I now loan to my said daughter the plantation" (and so on, describing these lands and certain slaves and mules); "when her daughter Elizabeth marries the one-half of the above named negroes shall be delivered to her and one-half of the plantation and one-half of the brick house on said plantation. I do hereby appoint T. W. Winter guardian and agent for his wife and his daughter during life." T. W. Winter was the husband of Sallie Ann and father of Elizabeth. The plaintiffs now suing for a part of the lands are the grandchildren of the testator, claiming as purchasers by virtue of item 5 of the will. The defendants claim under a conveyance from Elizabeth Bell and her husband, and her father and mother, executed to one Walker, in 1860, which was after the birth and death of Elizabeth Bell's child. They claim that, under the will, Elizabeth took an absolute estate in fee, by virtue of the statute of 1812, declaring estates in fee tail, thereafter attempted to be created, to be estates in fee simple. Their contention is that the will, in form, provides for an estate for life in Elizabeth with remainder to the heirs of her body, which under the influence of the rule in Shelley's case then in force, defining the word "heirs" in such a connection as denoting a limitation, vested in her an absolute estate; and that there is nothing in the devise which furnishes a just reason why it should not be accepted in its formal and technical sense. We think such is the *form* of the devise. Its language is: "If the said Elizabeth die and leave no heir or heirs of her body, my will is that all of the property she may acquire by this will shall be equally divided between all of my children living and such of my grandchildren whose parents may have died, and if she should die and leave an heir or heirs [of her body, the testator evidently meant to reiterate], I give it to them forever." On the other hand, it is contended by the plaintiffs that, viewing the will in its entirety, and the condition and surroundings of the testator, it is manifest

[Campbell v. Noble.]

that he did not intend the words "heirs of her body" and "heir or heirs" to be read, as written, and accepted according to their technical signification, but that he evidently used them in the sense of "child" or "children," thereby designating a particular class of persons who should take in remainder, withdrawing the devise from the operation of the rule in Shelley's case and the statute of 1812. Similar questions have been before the courts of the country, arising, both upon deeds and wills, in a multitude of cases ; many in our own court. The authorities are well collected in the briefs of respective counsel. It must be conceded that much strictness has been observed, in the adjudicated cases, in construing the words of limitation according to their legal and technical import ; some of the cases going so far as to hold that where such words are used, in defining the estate granted or devised, considered in and of themselves, creating an absolute estate, an express declaration in the instrument that only an estate for life, in the first taker, was intended, will not be permitted to overcome the legal effect of the words of the grant or devise itself ; but we think the result of the best considered cases is, without taking the pains to set them out here, that, in a proper case, where the instrument is so framed, in its entirety, and such terms and expressions are used therein, considered in the light of the condition and circumstances of the grantor or devisor, as to justify it, the court will first ascertain how the instrument should really be read, according to the true intent and meaning of the person speaking ; and if it is obvious that the word "heir" or "heirs" was used for "child" or "children," the mind will be permitted, in order to give effect to what was really intended to substitute the latter for the former expressions. This should not be done lightly, but upon weighty considerations, forcing the irresistible conviction that the substituted words were intended by the maker of the instrument. When, in a given case, it is found that this should be done, it will be done, and the legal effect of the instrument, as it was intended to be written, pronounced. The case of *May v. Ritchie*, 65 Ala. 60—an opinion delivered by the present Chief Justice—presents a striking illustration of this principle, in a case involving the proper reading and construction of a deed, wherein greater strictness is required than in

wills. We must look then to the will of Mr. Hogan, examine it in all its parts, consider his condition and circumstances, and determine, upon the strict rules we have announced, whether or not, as the plaintiffs contend, the expressions "heirs of. the body," and "heir or heirs" employed by the testator, were, in their legal sense, the terms he really intended to employ—whether he did not use them as synonymous with "child" or "children" The reporter will set out the will. We need not enlarge this opinion by quoting its language. It was drawn by a person utterly unskilled and incompetent to such a task. Manifestly no knowledge of, or regard to, the meaning of technical terms existed or was observed. Terms of different legal signification are used indiscriminately to express the same meaning. The criticisms of this court, in *May v. Ritchie*, 65 Ala. 602, *supra*, upon the deed therein under consideration, apply with great force to this will.

Upon mature consideration, our minds are without doubt—it is impossible to escape the conviction—that the testator intended to declare that if Elizabeth died leaving no child or children the estate should go to his children and grandchildren as in the will expressed; but if she left a child or children it should go to such child or children forever Thus construing the will, it follows, that the plaintiffs—the grandchildren of testator—took as purchasers, and their estates and right to recover are not affected by the conveyance of Mrs. Bell, who had only an estate for life.

Reversed and remanded.